**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CIV-62757-RAR**

**DAVID SUBIL**,

       Petitioner,

v.

**RICKY D. DIXON, SECRETARY**
**OF DEPARTMENT OF CORRECTIONS**,

       Respondent.[1]

_____/

**ORDER DENYING HABEAS CORPUS PETITION**

    **THIS CAUSE** is before the Court on a *pro se* Amended Petition for Writ of Habeas Corpus.  *See* Amended Petition [ECF No. 9] ("Am. Pet.").  Respondent filed its "Answer in Response to Order to Show Cause" [ECF No. 14] ("Response"), and Petitioner filed a Reply thereafter [ECF No. 17].  Having carefully reviewed the record and governing law, and for the reasons set forth below, the Amended Petition is **DENIED**.

**BACKGROUND**

    On September 23, 2013, the State of Florida charged Petitioner by Information with eight counts: two counts of grand theft of more than $20,000.00 but less than $100,000.00 in violation of Fla. Stat. § 812.014(2)(b)1 (Counts 1 and 2); one count of organized fraud of more than $20,000.00 but less than $50,000.00 in violation of Fla. Stat. § 817.034(4)(a)2 (Count 3); and five counts of communications fraud of $300.00 or more in violation of Fla. Stat. § 817.034(4)(b)1.

---

[1]  The original Respondent in this case, Mark S. Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021.  Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent.  *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").  The Clerk's Office is **DIRECTED** to make this modification on the docket.

(Counts 4–8).  Information [ECF No. 15-1] at 22–26.  Nearly four years later, on February 13, 2017, Defendant entered into a plea agreement with the State whereby he agreed to enter a no contest plea on the two grand theft counts and all five of the communications fraud counts.  Plea Agreement [ECF No. 15-2] at 21–23.  In exchange, the State agreed to dismiss the organized fraud count (Count 3) via a *nolle prosequi* and recommend a sentence of 90.075 months to be served concurrently on each count.  Disposition Order [ECF No. 15-2] at 25–28.  The state trial court accepted the plea and sentenced Petitioner in accordance with his plea agreement.  *Id.*; *see also* Plea Agreement at 23; Judgment and Sentence Orders [ECF No. 15-2] at 30–53.

Petitioner filed a direct appeal of his judgment and sentences with the Florida Fourth District Court of Appeal ("Fourth DCA").  Notice of Appeal from Final Judgment [ECF No. 15-2] at 64.  While on appeal, Petitioner's counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing that there was no good faith argument to be made that the trial court committed reversible error.  *See* Motion to Withdraw and *Anders* Brief [ECF No. 15-2] at 66–80.  Petitioner voluntarily withdrew his direct appeal, *see* Motion to Withdraw [ECF No. 15-2] at 103, and the Fourth DCA dismissed the appeal on July 27, 2017, *see* Fourth DCA Order [ECF No. 15-2] at 110.

On August 7, 2017, Petitioner filed a Motion for Postconviction Relief pursuant to Florida Rule of Criminal Procedure 3.850 in the trial court.  Postconviction Motion [ECF No. 15-2] at 112–135.  The Postconviction Motion alleged fifteen claims, including several ineffective assistance of counsel claims and an alleged violation of *Giglio v. United States*, 405 U.S. 150 (1972).  *See generally id.*; *see also* Memorandum Brief [ECF No. 15-2] at 137–65.  Then, on September 5, 2017, Petitioner filed a Supplemental Motion for Postconviction Relief which alleged five more grounds of ineffective assistance of counsel.  Supplemental Postconviction Motion [ECF No. 15-4] at 129–35.  The State filed a Response to the Petitioner's Postconviction

Motion and Supplemental Postconviction Motion arguing that the postconviction trial court should deny all claims. *See* State Response [ECF No. 15-5] at 53–70. On January 14, 2019, the postconviction trial court entered an order adopting the State's Response and denying all grounds raised within Petitioner's Postconviction Motion and Supplemental Postconviction Motion. Order Denying Postconviction Motion [ECF No. 15-6] at 264–70.

Petitioner filed a notice of appeal from the denial of his postconviction motions. Notice of Appeal from Denial of Postconviction Motion [ECF No. 15-6] at 275. In his Initial Brief, Petitioner argued that the postconviction trial court had erred in denying nine of the twenty total claims he raised in his Postconviction Motion and Supplemental Postconviction Motion. *See* Initial Brief [ECF No. 15-6] at 279–300; [ECF No. 15-7] at 1–29. On August 22, 2019, the Fourth DCA issued an unwritten opinion affirming the postconviction trial court. *See Subil v. State*, 279 So. 3d 712 (Fla. 4th DCA 2019) (Table). Although Petitioner filed a motion for rehearing, *see* Motion for Rehearing [ECF No. 15-7] at 112–116, the Fourth DCA denied it, *see* Order Denying Motion for Rehearing [ECF No. 15-7] at 118. The Fourth DCA issued its mandate on October 18, 2019. *See* Mandate [ECF No. 15-7] at 120.

Petitioner then filed his initial Petition for Writ of Habeas Corpus pursuant to § 2254 on November 4, 2019.[2] *See* Petition [ECF No. 1]. The Court directed Petitioner to file an amended petition to comply with § 2254 and the district court's local rules. *See* Order Requiring Amended Petition [ECF No. 6]. Petitioner filed his Amended Petition on November 25, 2019, in which he raises the following three grounds for relief:

1. The state postconviction court's determination that no *Giglio* violation occurred was based on an unreasonable determination of the facts. *See* Am. Pet. at 4.

---

[2] "Under the 'prison mailbox rule,' a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

2. The state postconviction court's denial of Petitioner's claim that trial counsel was ineffective for failing to investigate a "location tracking C.D." was based on an unreasonable application of law. *See id.* at 7.

3. The state postconviction court's denial of Petitioner's claim that trial counsel was ineffective for failing to investigate cell phone forensic reports was an objectively unreasonable application of law and was based on an unreasonable determination of the facts. *See id.* at 9.

## PROCEDURAL REQUIREMENTS

### A. Timeliness

Stated broadly, "a person in custody pursuant to the judgment of a State court" has a one-year period to file a habeas corpus petition. *See* 28 U.S.C. § 2244(d)(1).[3] A limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining the State may express its intent to "waive the limitations bar"). Here, Respondent has conceded that this action is timely filed under 28 U.S.C. § 2244(d). *See* Response at 28 ("Under 28 U.S.C. § 2254(d)(1) the time for filing Petitioner's claims does not appear to have expired."). Accordingly, the Court shall treat the Amended Petition as timely.

### B. Exhaustion

Pursuant to 28 U.S.C. § 2254(b)–(c), habeas petitioners must exhaust their claims before presenting them in a federal habeas petition. *See also Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (clarifying this is "[g]enerally" how this rule functions). This requirement is met if a petitioner "fairly present[ed] every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *See Mason v. Allen*, 605

---

[3] The Court takes judicial notice of the Florida Department of Corrections' inmate release records, which show that Petitioner completed his sentence and was released on March 27, 2020. However, it is uncontested that Petitioner was "in custody" at the time his Amended Petition was filed, so the Court retains jurisdiction over this matter even though Petitioner is no longer "in custody" as required by § 2254(a). *See Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) ("We have interpreted the statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack *at the time his petition is filed*.") (emphasis added).

F.3d 1114, 1119 (11th Cir. 2010) (cleaned up).  "If a petitioner fails to 'properly' present [their] claim to the state court—by exhausting [their] claims and complying with the applicable state procedure—prior to bringing [their] federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim."  *Id.*  In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  "In Florida, exhaustion usually requires not only the filing of a [Florida Rule of Criminal Procedure 3.850] motion, but an appeal from its denial."  *Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 521 (11th Cir. 2019) (quoting *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)).

Respondent claims that "portions of Petitioner's claims are unexhausted."  Response at 29. Upon a close review of the Response, Respondent appears to argue that Ground One is partially unexhausted because "Petitioner attempted to raise [new] arguments on this point in his initial brief on [direct] appeal."  *Id.* at 59.  Respondent does not seem to suggest that Grounds Two and Three are unexhausted, but never explicitly concedes this point.  *See generally id; see also McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) (holding an exhaustion defense "can only be waived expressly").  Nevertheless, "[w]hen relief is due to be denied even if claims are not procedurally barred, [the court] can skip over the procedural bar issues."  *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011).  Given that Petitioner's claims plainly fail on the merits, even under a *de novo* standard of review, the Court chooses to "skip over" any potential exhaustion issues and proceed directly to the merits.

## LEGAL STANDARD

### A.  *Review of § 2254 Petition*

"As amended by [the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")], 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a

writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Some of the more restrictive limits are found in § 2254(d). Under that provision, a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Consequently, § 2254(d) constructs a "highly deferential standard for evaluating state-court rulings" because, after all, this standard "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

"A state court's decision is 'contrary to' federal law if the 'state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Consalvo v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 842, 844 (11th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)) (brackets omitted). A state court's decision qualifies as an "an unreasonable application of federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Consalvo*, 664 F.3d at 844 (quoting *Williams*, 529 U.S. at 413) (cleaned up). "'If this standard [seems] difficult to meet'—and it is—'that is because it was meant to be.'" *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

By its own plain terms, § 2254(d)'s deferential standard applies only when a claim "was adjudicated on the merits in State court proceedings[.]" 28 U.S.C. § 2254(d); *see also Cullen*, 563 U.S. at 181 ("If an application includes a claim that has been adjudicated on the merits in State court proceedings, § 2254(d), an additional restriction applies."); *Cone v. Bell*, 556 U.S. 449, 472

(2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA.").  The summary denial of a claim with no articulated reasons presumptively serves as an adjudication on the merits subjecting the claim to § 2254(d)'s additional restrictions.  *See Richter*, 562 U.S. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").  This is because federal courts ordinarily presume that § 2254(d)'s deferential standard applies when a constitutional claim has been presented to a state court and denied in that forum.  *See, e.g.*, *id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

At the same time, "federal court[s] should 'look through' [an] unexplained decision to the last related state-court decision that *does* provide a relevant rationale" if one exists.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (emphasis added).  From there, federal courts "presume that the unexplained decision adopted the same reasoning."  *Id.*  "[T]he State may rebut [that] presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed."  *Id.*

### B.  *Ineffective Assistance of Counsel*

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e."  U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of

counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).

Regarding the deficiency prong, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" during the proceedings. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). If "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel did not perform deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong, "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a defendant enters a guilty or no contest plea, as opposed to being convicted at trial, the defendant can show prejudice by demonstrating that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have instead insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Liebman v. Dep't of Corr.*, 411 F. App'x 261, 263 (11th Cir. 2011) (applying *Hill* to no contest pleas).

## ANALYSIS

### A. *Ground One*

In Ground One of the Amended Petition, Petitioner argues that "[t]he postconviction court's holding that [there was no *Giglio* violation], was an objectively unreasonable application

of [*Giglio*] and [was] based on an unreasonable determination of the facts in light of the evidence presented." Am. Pet. at 4. Before Petitioner entered a no contest plea, trial counsel filed a motion to suppress. *See* Motion to Suppress [ECF No. 15-1] at 72–83. In that motion, counsel argued that law enforcement violated Petitioner's Fourth Amendment rights by monitoring a target cell phone "to multiple locations including into and around [Petitioner's] private residence" without first obtaining a warrant. *Id.* at 78–79. Petitioner says that, during the suppression hearing, a law enforcement agent named Mark Baker testified that: (1) the target cell phone was only tracked to a generalized area in a neighborhood and did not specifically track Petitioner into his home; (2) a physical surveillance team, not cell site data, was used to identify Petitioner as the owner of the target cell phone; and (3) when the target cell phone was analyzed, it contained pictures, text messages, and emails indicating that the phone belonged to Petitioner. Am. Pet. at 4.

Petitioner claims that these three statements were false and that this false testimony led to the denial of Petitioner's motion to suppress. *See* Am. Pet. at 5 ("[T]he false testimony and [the] prosecution's false argument based on the false testimony were clearly material to the court's denial of the suppression motion."). The denial of the motion to suppress, in turn, was the primary motivating factor in causing Petitioner to enter a no contest plea. *See id.* ("The only reason the [P]etitioner plead [sic] NOLO in this case was because [of] Agent Baker['s false testimony]."). Respondent argues that no *Giglio* violation occurred because Agent Baker's testimony was truthful and that, in any event, it was not material since Petitioner's no contest plea was unrelated to the trial court's denial of the motion to suppress. *See* Response at 45 ("The record, including Petitioner's attachments, do not demonstrate the falsity of [Agent Baker's] statements.").

Agent Baker, a special investigator with the Florida Department of Law Enforcement, began investigating allegations of theft related to several frozen seafood companies. *See* Motion to Suppress Hearing Transcript [ECF No. 16-1] at 7–8, 14 ("Hr'g Tr."). Agent Baker contacted

the victim businesses and each told a similar story: A person named either "Rick Stevenson" or "Rick Acosta," who held himself out to be a representative from Celebration Cruise Lines, would order frozen seafood from the company. *Id.* at 15–17. Once the delivery was made, the company would receive a fraudulent check that purported to be from Celebration Cruise Lines. *Id.* at 23–29. Through the course of his investigation, Agent Baker contacted "Mr. Stevenson" and arranged for a staged delivery of seafood on June 5, 2013, at a cross-dock in Pompano Beach, Florida. *Id.* at 42–45. Agent Baker and his investigation team received a court order to obtain cell phone data linked to the phone number used by "Mr. Stevenson" and determined that "Mr. Stevenson" was an alias used by Petitioner. *Id.* at 47–51. On June 5, 2013, Petitioner and another person arrived at the pre-arranged delivery site where Agent Baker proceeded to arrest Petitioner. *Id.* at 54–57. Trial counsel unsuccessfully attempted to suppress the majority of the evidence obtained during Agent Baker's investigation, *see* Motion to Suppress [ECF No. 15-1] at 72–83, and Petitioner's contention—both in the instant Petition and in his Postconviction Motion—is that the outcome of the suppression hearing would have been different if Agent Baker did not provide perjured testimony, *see* Am. Pet. at 4–6; Postconviction Motion at 115–18.

The United States Supreme Court has held that a defendant's due process rights under the Fourteenth Amendment are infringed when the prosecution intentionally suppresses material evidence. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "*Giglio* error, a species of *Brady* error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that prosecution knew, or should have known, of the perjury." *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (internal citation omitted); *accord Giglio*, 405 U.S. at 154 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To establish a *Giglio* claim, a habeas petitioner must prove two elements. First, the petitioner must show that "the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony." *Ford v. Hall*,

546 F.3d 1326, 1332 (11th Cir. 2008).   Second, Petitioner must then prove that there is a "reasonable likelihood" that the false testimony proffered could have affected the judgment. *Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014).  Even if Petitioner successfully demonstrates that a *Giglio* violation occurred, relief on collateral review is not warranted unless Petitioner can show that the *Giglio* violation "had a substantial and injurious effect" on the outcome of the proceedings.  *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1355 (11th Cir. 2011) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).[4]

Ground One of the Amended Petition contains a very logical argument: Agent Baker made three false statements during the suppression hearing, these false statements were material to the trial court's decision to deny Petitioner's motion to suppress, and Petitioner's decision to enter a no contest plea was directly predicated on the denial of his motion to suppress.  *See* Am. Pet. at 4–6.  The Court shall review Ground One *de novo* since it has chosen to skip over any potential procedural bar issues.  *See Conner v. GDCP Warden*, 784 F.3d 752, 767 n.16 (11th Cir. 2015)

---

[4] As an aside, the Court is skeptical that Petitioner can raise a *Giglio* claim under the facts of this case— even if Petitioner demonstrates that the State used and relied on false information.  In *United States v. Ruiz*, 536 U.S. 622 (2002), the Supreme Court held that a defendant who decides to plead guilty waives his or her right to have the prosecutor disclose potentially impeaching information pursuant to *Brady*.  *Id.* at 629. While the Eleventh Circuit has not conclusively opined on the issue, other federal courts have held that *Ruiz* applies to all evidence under *Brady*.  *See United States v. Webb*, 651 F. App'x 740, 744 (10th Cir. 2016) (citing cases); *Glenn v. Woods*, No. 13-CV-10495, 2014 WL 6986173, at *7 (E.D. Mich. Dec. 10, 2014) (collecting additional cases).  Because *Giglio* is merely a subcategory of *Brady*, it is logical that the Court's holding in *Ruiz* means that a defendant who enters a plea knowingly and voluntarily also waives his or her right to raise a future *Giglio* claim.  *See Zink v. Sec'y, Dep't of Corr.*, No. 18-cv-2904, 2022 WL 252428, at *3–*4 (M.D. Fla. Jan. 27, 2022) ("Because the [*Brady* and *Giglio*] claims are not jurisdictional defects and Zink knowingly and voluntarily pleaded guilty, Zink waived [his *Brady* and *Giglio* claims] by pleading guilty."); *Sampson v. United States*, CV 416-016, 2017 WL 6758395, at *6 (S.D. Ga. Nov. 14, 2017) ("Because Petitioner never went to trial, *Giglio* is inapplicable to Petitioner's case.").  The Court also notes that the protections of *Brady/Giglio* may not even apply during suppression hearings, regardless of whether the defendant ultimately pleads guilty.  *See Phillips v. United States*, No. 08-81283-CIV, 2014 WL 12891850, at *14 n.19 (S.D. Fla. Mar. 7, 2014) (quoting *United States v. Harmon*, 871 F. Supp. 2d 1125, 1151–52 (D.N.M. 2012)) ("[T]he Court assumes that *Brady* and its progeny apply [at suppression hearings] . . . [h]owever, the Court notes that the issue is not settled."), *vacated in part on other grounds by* 849 F.3d 988 (11th Cir. 2017).  Nevertheless, since neither the Petitioner nor Respondent have addressed this issue, the Court will presume that Petitioner is able to raise a *Giglio* claim under these circumstances.

("Courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." (cleaned up)).

      *i.  Agent Baker's First Statement: Geolocation Could Not Conclusively Identify Petitioner*

Agent Baker's first contested statement was that geolocation data could not be used, by itself, to specifically identify Petitioner as "Mr. Stevenson." This statement is not false, nor is it material. Early in his investigation, Agent Baker became aware that the suspect had called the victim businesses using a phone number that ended in 2689. Hr'g Tr. at 24–29. Agent Baker requested and received a court order from the Fourth Judicial Circuit Court in and for Duval County, Florida to place a pen register on the 2689 number. *Id.* at 31–34. Prior to the June 2013 sting operation, Agent Baker returned to the Duval County circuit court to receive geolocation information from the cell phone ending in 2689. *Id.* at 47–48. Agent Baker testified that geolocation data is delivered in the form of latitude and longitude coordinates, but that the accuracy of these coordinates could range from one meter to nearly 2,500 meters. *Id.* at 49–50; Second Motion to Suppress Hearing Transcript [ECF No. 16-2] at 22–27 ("Second Hr'g Tr."). Agent Baker also testified that his data analyst used geolocation data to narrow the location of the cell phone "to a very small area in Miami." *Id.* at 50–51. While the geolocation area was small, Agent Baker testified that the area encompassed more than one address. *Id.* at 51.

On the second day of the suppression hearing, both Agent Baker and Davon Harrison, another special agent, provided a "location tracking C.D." which contained all the geolocation data from the cell phone provider. *See* Second Hr'g Tr. at 14, 17–18. Agent Harrison then testified about how the geolocation information was requested, the accuracy of the geolocation coordinates, and how the data received was "historical" and did not provide the location of the target cell phone

in real-time.  Second Hr'g Tr. at 36–44.[5]  Petitioner argues the location tracking C.D. proves that Agent Baker lied about the precision of the geolocation data since the coordinates therein "show that the phone was tracked into [Petitioner's] home numerous times."  Am. Pet. at 4.

Contrary to Petitioner's allegations, there is no evidence indicating that Agent Baker (or Agent Harrison) lied about the scope of the geolocation data.  Petitioner states in his Reply that the record "shows a Google map with a red dot in the center of Petitioner's home generated using the coordinates from the location tracking C.D. proving that the phone was tracked into Petitioner's home and not to a general area."  Reply at 2; *see also* Google Maps Exhibits [ECF No. 15-3] at 119–25.  While both agents agreed that the geolocation data would provide a specific geographical coordinate—which corresponds to a physical location that could be identified on a map—this would be an incomplete account of the geolocation's accuracy.  Second Hr'g Tr. at 17, 22–23, 36–37.  The agents also testified that these coordinates did not (and could not) establish the precise place where the target cell phone was at a specific time but were instead used to calculate a "certainty factor," which is a certain distance from the coordinate where the phone could be (*e.g.*, a certainty factor of "150" means that the cell phone would be within 150 meters of the identified coordinate position).  *Id.* at 23–26, 39–44; *see also United States v. Sykes*, No. 15-CR-00184, 2016 WL 8291220, at *6 (E.D.N.C. Aug. 22, 2016) (defining "certainty factor").  An investigative report from the Florida Department of Law Enforcement shows that two separate households within the certainty factor of the coordinate were investigated, *see* Investigative Report [ECF No. 15-3] at 292–93, confirming that law enforcement could not be sure that the coordinate established that the

_____

[5]  In his Reply, Petitioner argues that this Court should disregard all of Agent Harrison's testimony because it was stricken during the suppression hearing.  Reply at 1.  While Petitioner is correct that a portion of Agent Harrison's testimony was stricken from the record, the vast majority of it was not.  *See* Second Hr'g Tr. at 44–45.

cell phone was inside Petitioner's residence.  In short, the evidence shows that Agent Baker did not lie about the precision of the geolocation.

Further, as previously stated, the evidence was not material.  Petitioner's contention is that using geolocation data to specifically track him in his own home is an unconstitutional warrantless search under the Fourth Amendment.  True, the Supreme Court has held that the use of technology to obtain "any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search." *Kyllo v. United States*, 533 U.S. 27, 34–35 (2001) (cleaned up); *see also United States v. Karo*, 468 U.S. 705, 716 (1984) ("We cannot accept the Government's contention that it should be completely free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause or reasonable suspicion, whether a [person] is in an individual's home at a particular time.").  Likewise, in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court held that law enforcement cannot obtain historical cell-site records (*i.e.*, cell phone data showing where the cell phone has previously been) without first obtaining a warrant upon a showing of probable cause.  *See id.* at 2217–18, 2221.

However, prior to Petitioner's arrest on June 5, 2013, there was no constitutional requirement that law enforcement had to obtain a warrant supported by probable cause to receive cell site location information.  Prior to the Supreme Court's decision in *Carpenter*, the Eleventh Circuit held that a wireless subscriber "had no reasonable expectation of privacy in [cell site data]," and that law enforcement could satisfy the Fourth Amendment with a court order pursuant to the Stored Communications Act instead of a warrant.  *United States v. Davis*, 785 F.3d 498, 517–18 (11th Cir. 2015) (en banc), *abrogated by Carpenter*, 138 S. Ct. at 2223.  Indeed, Florida's counterpart to the Stored Communications Act allowed law enforcement to obtain "a record or other information pertaining to a subscriber or customer of [an electronic communication

service],” with either a warrant or a court order that was based on “specific and articulable facts showing that there are reasonable grounds to believe that [the records] are relevant and material to an ongoing criminal investigation.”  Fla. Stat. § 934.23(4)(a), (5) (2013); *Tracey v. State*, 152 So. 3d 504, 509 (Fla. 2014).  Implicit in these pre-*Carpenter* decisions is the rationale that, while geolocation data could be used to “reveal certain patterns with regard to [the defendant’s] physical location in the general vicinity of his home,” the data does not produce “precise locations” that transform it into an impermissible warrantless search of the home.  *Davis*, 785 F.3d at 516; *see also United States v. Graham*, 824 F.3d 421, 426 n.3 (4th Cir. 2016) (en banc) (distinguishing *Karo* since “the [cell site location information] obtained here does not enable the government to ‘place an individual’ at home or at other private locations.”), *abrogated by Carpenter*, 138 S. Ct. at 2223.

All this to say, Agent Baker did not obtain a warrant but, instead, obtained a court order pursuant to Fla. Stat. § 934.23.  *See* Court Order [ECF No. 15-2] at 175–82.  And, as the Court has suggested, Petitioner has not shown how Agent Baker’s first statement was false.  He only says that it is, which is not enough to meet his heightened pleading burden.  *See Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (“The § 2254 Rules and the § 2255 Rules mandate fact pleading as opposed to notice pleading, as authorized under Federal Rule of Civil Procedure 8(a) . . . . [Thus,] habeas corpus petitions [and related actions] must meet heightened pleading requirements.” (cleaned up)).

Nor has Petitioner shown that the statements were material for *Giglio* purposes. True, Agent Baker’s testimony (and the resulting evidentiary ruling) had *some* effect on Petitioner’s decision to enter a no contest plea.  But, based on this record, the evidentiary ruling would have been the same either way and thus Petitioner would have pled no contest either way. This, in turn,

means Petitioner cannot show materiality. The Court finds that materiality cannot be shown for three reasons.

*First*, Agent Baker obtained the geolocation data pursuant to a court order and in a manner that, at the time, complied with federal and Florida law, so the good faith exception to the exclusionary rule rendered the geolocation data admissible no matter how precise the geolocation data was. *See United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018); *Ferrari v. State*, 260 So. 3d 295, 306 (Fla. 4th DCA 2018); *see also United States v. Curtis*, 901 F.3d 846, 848 (7th Cir. 2018) ("[E]vidence obtained in good-faith reliance on a statute later declared unconstitutional need not be excluded.").

*Second*, "[i]n habeas corpus proceedings, federal courts generally do not review a state court's admission of evidence." *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998). The only exception to that rule is when "the ruling affects the fundamental fairness of the trial." *Id.* Since the state court adhered to existing law, Petitioner has not shown that any constitutional error—if any—violated principles of fundamental fairness.

*Third*, "such trial court errors are subject to the harmless error analysis and will not be the basis of federal habeas relief unless the error had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* (cleaned up); *see also Rodriguez*, 756 F.3d at 1302 ("Specifically, a petitioner must demonstrate that the constitutional error—here the *Giglio* violation—had substantial and injurious effect or influence in determining the jury's verdict." (cleaned up)). In other words, petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1234 (11th Cir. 2014) (cleaned up). Here, the statement had no "substantial and injurious effect or influence" on Petitioner's decision to plead no contest as it did not impact the outcome of the suppression hearing which, by Petitioner's own admission, was the reason that he chose to

enter a plea.  *See Rodriguez*, 756 F.3d at 1306.  Accordingly, this first statement did not amount to a *Giglio* violation.

### ii.   Agent Baker's Second Statement: A Physical Surveillance Team was Used

The second statement at issue is closely related to Agent Baker's geolocation statement. And, again, it was not false nor material. Agent Baker specifically testified that a physical surveillance team was dispatched to the area identified by the cell phone's geolocation data to identify any potential suspects residing in the area.  Hr'g Tr. at 51.  Petitioner argues that Agent Baker lied about the use of a physical surveillance team and that he was only identified using the improper geolocation data.  Without any evidence in the record to support Petitioner's allegations, Petitioner has advanced a speculative averment that is nowhere close to meeting his burden under *Giglio*.  *See* Am. Pet. at 4 ("Although Agent Baker testified that a physical surveillance team originally identified [P]etitioner by way of physical surveillance . . . how [was it that] an analyst who simply searched law enforcement databases using the location coordinates on the C.D. [came] up with the occupants of [P]etitioner Subil's home.  (Baker fabricated the existence of the physical team).").  That, of course, is not enough factual content for relief on federal habeas review.  *See Borden*, 646 F.3d at 810 ("The § 2254 Rules and the § 2255 Rules mandate fact pleading as opposed to notice pleading, as authorized under Federal Rule of Civil Procedure 8(a) . . . . [Thus,] habeas corpus petitions [and related actions] must meet heightened pleading requirements." (cleaned up)).  Since Petitioner raises no more "than a speculative possibility that the [State] violated *Brady* or *Giglio*," the second statement is also insufficient to allege prosecutorial misconduct.  *United States v. Sotolongo*, 748 F. App'x 879, 886 (11th Cir. 2018).

### iii.   Agent Baker's Third Statement: The Target Cell Phone Incriminated Petitioner

The final statement concerns the forensic analysis of the cell phone ending in 2689.  Upon arresting Petitioner, Agent Baker noticed that there were several cell phones located in Petitioner's

vehicle.  Hr'g Tr. at 60–61.  Agent Baker called the cell phone number ending in 2689, and immediately seized the phone that began ringing in response—an "LG Metro PCS" phone ("LG Phone").  *Id.* at 61.  Although Petitioner denied ownership of the LG phone, he admitted that he owned a different cell phone in the vehicle which was also seized, a "Pantech AT&T" phone ("Pantech Phone").  *Id.* at 62.  Agent Baker eventually received a search warrant to search both phones.  *See id.* at 62–66.  A forensic report of the LG Phone revealed that the phone contained pictures of Petitioner as well as phone calls and text messages exchanged between Petitioner and his then-girlfriend.  *Id.* at 68.  Agent Baker ultimately concluded that the LG Phone, which contained personal information linked to Petitioner, was the phone used during the commission of the charged offenses. *Id.* at 62, 68.  Petitioner claims that this statement is false since the forensic reports in evidence show that the Pantech Phone—not the LG Phone—had the cell phone number ending in 2689.

There are two forensic reports in the record: one for the LG Phone (which Agent Baker claimed had the phone number ending in 2689) and the Pantech Phone.  As Respondent concedes, though, the record is unclear as to which report actually corresponds to each phone.  *See* Response at 52–53 ("Admittedly, however, the MSISDN [for the Pantech Phone] appears to be listed as [the number ending in 2689].").  To illustrate, one forensic report that is purportedly for the Pantech Phone lists the cell phone number as the one ending in 2689—which would contradict Agent Baker's testimony.  *See* Forensic Report [ECF No. 15-6] at 152.  But the forensic report for the LG Phone contains pictures, text messages, and other data that is consistent with Agent Baker's findings that the LG Phone belonged to Petitioner.  *See id.* at 133–46.

In truth, though, both phones incriminated Petitioner.  Petitioner admitted upon his arrest that he owned the Pantech Phone, and there was no subsequent testimony that contradicts this initial statement.  Hr'g Tr. at 61–62.  If the Pantech Phone had the number ending in 2689, then

Petitioner admitted that the cell phone with the phone number used by "Rick Stevenson" to contact the victim businesses belonged to him.  The Pantech Phone also contained contact information for locations, businesses, and persons that were involved in the charged offenses.  *See* Extraction Report [ECF No. 15-6] at 153–54.  Conversely, if the LG Phone had the number ending in 2689, then Petitioner's ownership of the phone could be inferred by its contents and—as the Court just explained—Agent Baker's statements during the suppression hearing.  *See* Hr'g Tr. at 66–69; Forensic Report [ECF No. 15-6] at 133–46.

Under either scenario, Agent Baker's third statement is plainly not material for *Giglio* purposes because the evidence presented at the suppression hearing shows that: (1) one of the two phones had a number that ended in 2689, and (2) there was sufficient evidence presented to the trial court to find Petitioner owned (or at least had control over) both phones.  Consequently, like Agent Baker's other two statements, Petitioner fails to meet his burden under *Giglio*.  Since all three of Agent Baker's statements were neither false nor material to the outcome of the suppression hearing, and thus Petitioner's decision to enter a no contest plea, Petitioner cannot meet his burden even under *de novo* review.

Of course, because Petitioner cannot meet his burden under that more lenient standard, he certainly cannot meet his burden under § 2254(d) if it applies.  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("[W]e need not determine whether AEDPA's deferential standard of review, 28 U.S.C. § 2254(d), applies in this situation. That is because, even if AEDPA deference does not apply, Thompkins cannot show prejudice under *de novo* review, the more favorable standard of review for Thompkins." (cleaned up)).  Ground One of the Amended Petition is, in short, **DENIED**.

### B. Grounds Two and Three

Grounds Two and Three of the Amended Petition restate the same arguments made in Ground One in the form of ineffective assistance of counsel claims. Ground Two alleges that trial counsel was ineffective for failing to review the location tracking C.D., which allegedly would have allowed counsel to effectively cross-examine Agent Baker about how the geolocation data was used to specifically track Petitioner inside his home. Am. Pet. at 7–8. Next, Ground Three argues that counsel was ineffective for not reviewing the cell phone forensic reports, which would have allowed counsel to cross-examine Agent Baker about the discrepancies between the Pantech Phone and the LG Phone forensic reports. *Id.* at 9–10. As with Ground One, the Court will review these ineffective assistance of counsel claims *de novo* because it makes no difference to the outcome. *See Conner*, 784 F.3d at 767 n.16 ("The Court has previously affirmed the denial of § 2254 relief after conducting *de novo* review without resolving whether AEDPA deference applies.").

In *Strickland*, the Court held that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." *Strickland*, 466 U.S. at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112–13 (1976)). Put another way, the prejudice prong of *Strickland* and the materiality prong of *Giglio* are nearly identical. *Compare id.* ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."), *with Giglio*, 405 U.S. at 154 ("A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." (cleaned up)); *see also, e.g.*, *Lawler v. Warden*, 631 F. App'x 905, 911–12 (11th Cir. 2015) (denying both a *Giglio* claim and an ineffective assistance of counsel claim "because, as discussed above, Steed's testimony was not material to the outcome of guilt").

Grounds Two and Three of the Amended Petition allege that, had counsel properly investigated the evidence, he would have been able to impeach Agent Baker when he lied during the suppression hearing. *See* Am. Pet. at 7–10. But as the Court has extensively discussed above, Agent Baker did not lie and—even if he did—those lies would not have affected the outcome of the suppression hearing or even Petitioner's decision to enter a no contest plea. Petitioner has failed to meet the materiality standard of *Giglio* because there was no "reasonable likelihood" the allegedly perjured testimony affected the outcome of the proceedings. This standard is "considerably less onerous" than the "reasonable probability standard" utilized in both *Brady* and *Strickland*. *See Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1283–84 (11th Cir. 2005). It follows that, if a petitioner fails to show materiality under *Giglio*, they cannot possibly show prejudice under *Strickland*.

Here, Petitioner was not prejudiced by trial counsel's alleged failure to review either the location tracking C.D. or the forensic reports since it would not have resulted in meritorious impeachment or in a different outcome at the suppression hearing. *See United States v. Clarke*, 442 F. App'x 540, 545 (11th Cir. 2011) (citing *Strickland*, 466 U.S. at 694) ("Because any impeachment . . . would not have changed the outcome of the trial, Clarke has failed to demonstrate prejudice."). Grounds Two and Three of the Amended Petition are, therefore, **DENIED**.

## EVIDENTIARY HEARING

No evidentiary hearing is warranted in this matter. *See Shriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the [state court] record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## CERTIFICATE OF APPEALABILITY

After careful consideration of the record in this case, the Court declines to issue a certificate of appealability ("COA"). A habeas petitioner has no absolute entitlement to appeal a district

court's final order denying his habeas petition.  Rather, to pursue an appeal, a petitioner must obtain a COA.  *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009).

Issuance of a COA is appropriate only if a litigant makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To do so, litigants must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  And "[w]here a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)).

Here, reasonable jurists would not find the correctness of the Court's merits rulings debatable.  Accordingly, a COA must be denied on all claims.

## **CONCLUSION**

Having carefully reviewed the record and governing law, it is hereby

**ORDERED AND ADJUDGED** that the Amended Petition [ECF No. 9] is **DENIED** on the merits.  Any request for a certificate of appealability is **DENIED**, and an evidentiary hearing is **DENIED**.  All deadlines are **TERMINATED**, and any pending motions are **DENIED** as moot. Accordingly, this case is **CLOSED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 14th day of March, 2022.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:    David Subil
       43895-004
       Miami Federal Detention Center
       Inmate Mail/Parcels
       P.O. Box 019120
       Miami, FL 33101
       PRO SE

       Jeanine Marie Germanowicz
       Florida Office of the Attorney General
       1515 N Flagler Drive
       Suite 900
       West Palm Beach, FL 33401
       Email: CrimAppWPB@MyFloridaLegal.com

       Noticing 2254 SAG Broward and North
       Email: CrimAppWPB@MyFloridaLegal.com